23 P.3d 477 (2001)
SAMIS LAND CO., The Estate of Samuel Israel, and the Samuel Israel Living Trust, Respondents,
v.
CITY OF SOAP LAKE, Petitioner.
No. 68520-7.
Supreme Court of Washington, En Banc.
Argued June 27, 2000.
Decided May 24, 2001.
*480 Foster, Pepper & Shefelman, Peter Stephen DiJulio, Grover E. Cleveland, Hugh Davidson Spitzer, Seattle, amicus curiae on behalf of Association of Wash. Cities and City of Ocean Shores.
Greg Overstreet, Olympia, amicus curiae on behalf of Building Industry Association.
Garvey, Schubert & Barer, William Colwell Severson, Seattle, amicus curiae on behalf of Ocean Shores Property Owners.
City of Soap Lake, Soap Lake, Moe & Allan, Wallace Edward Allan, Ephrata, for Petitioner.
Perkins, Coie, Scott M. Edwards, Seattle, for Respondent. *478
*479 BRIDGE, J.
The issue here is whether a "standby charge" imposed by the City of Soap Lake upon vacant, unimproved, uninhabited lots that abut but are unconnected to its water and sewer lines is a regulatory fee or a property tax. We find that the charge is a property tax and that, because it is not assessed uniformly according to the respective values of the properties within the class, it violates article VII, section 1 of the Washington Constitution. We therefore affirm.

FACTS
Over the past three decades, respondents Samis Land Company, The Samuel Israel Living Trust, and the Estate of Samuel Israel (hereinafter, collectively, "Samis") have acquired approximately 200 platted, vacant lots in the City of Soap Lake ("City") and held the lots without significant development. In 1989, the City enacted Soap Lake Municipal Code (SLMC) 13.08.175, imposing a flat-rate $60 annual charge on any "vacant, unimproved land which shall abut a line providing water service or sewer service but have no connection thereto." Since 1990, Samis has paid the City more than $46,000 in standby charges.
In February 1996, Samis stopped paying such charges in the wake of our decision in Covell v. City of Seattle,[1] and in July 1996, Samis filed suit for a full refund of all charges previously paid as well as equitable relief permanently enjoining the City from collecting any more standby charges. Samis then moved for a partial summary judgment that the charge was a property tax that violated the tax uniformity requirement of Wash. Const. art. VII, § 1. The Grant County Superior Court denied the motion, ruling that the charge was not a tax, but rather simply a fee for benefits received, and thus, article VII, section 1 did not apply. The Court of Appeals accepted discretionary review and reversed, concluding that the charge was in fact an unconstitutional property tax under the tests articulated in Covell.[2] We granted review.

ANALYSIS
The parties agree that the sole issue before us is whether the trial court erred in rejecting Samis' motion for a partial summary judgment that SLMC 13.08.175 levies an unconstitutional property tax.[3] We review *481 summary judgment rulings de novo, viewing all facts and reasonable inferences in a light most favorable to the nonmoving party.[4] Summary judgment is authorized under CR 56(c) only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. "A material fact is one upon which the outcome of the litigation depends in whole or in part."[5]
The Soap Lake ordinances at issue here are codified at SLMC 13.08.175:
13.08.175 Standby charge for property abutting water or sewer line.
A. Any person, firm or corporation owning or purchasing vacant, unimproved land which shall abut a line providing water service or sewer service but have no connection thereto shall pay a standby charge of sixty dollars per year per platted lot or unplatted area.
B. The assessment as stated further in subsection A of this section shall be assessed quarterly by the clerk-treasurer of the city on the fifteenth days of January, April, July and October of each year.
C. The assessment shall be in addition to all other assessments or charges made in relationship to the usage of water or sewer.
D. This charge may be enforced at the option of the city by filing a lien as against said property. The clerk-treasurer shall file the lien against said property thirty days after the payment is due. (Ord. 744, 1990; Ord. 737 §§ 1-4, 1989).
Municipal ordinances, like state statutes, are presumed constitutional, except where a suspect class or fundamental right is implicated.[6] To rebut that presumption, it must be clear that the legislation cannot reasonably be construed in a manner that comports with constitutional imperatives.[7]
Soap Lake argues that its standby charge is merely a fee collected in exchange for public benefits conferred upon Samis, namely, the nearby installation of city water and sewer lines.[8] Local governments have authority under their general article XI, section 11 police powers to require payment of fees that are "`akin to charges for services rendered'"[9] in that they are deposited into a segregated fund directly related either to the provision of a service received by the entities paying the fees or to the alleviation of a *482 burden to which they contribute.[10] Such charges, which this court has collectively referred to as "regulatory fees,"[11] include a wide assortment of utility customer fees, utility connection fees, garbage collection fees, local storm water facility fees, user fees, permit fees, parking fees, registration fees, filing fees, and license fees.
Because such fees are not considered taxes, they are exempt from fundamental constitutional constraints on governmental taxation authority.[12] There is thus an inherent danger that legislative bodies might circumvent constitutional constraints, such as the all-important tax uniformity requirement[13] or the one percent ceiling,[14] by levying charges that, while officially labeled "regulatory fees," in fact possess all the basic attributes of a tax. As we noted in Covell, unless sharp distinctions between fees and taxes are maintained in the law, "`virtually all of what now are considered "taxes" could be transmuted into "user fees" by the simple expedient of dividing what are generally accepted as taxes into constituent parts, e.g., a "police fee".'"[15] Courts must therefore look beyond a charge's official designation and analyze its core nature by focusing on its purpose, design and function in the real world.[16]
Over the years, our caselaw has identified several attributes that distinguish fees from taxes. These attributes were consolidated into a three-part test in Covell, where we held that Seattle's residential street utility charge was in fact an unconstitutionally imposed property tax. First, one must consider whether the primary purpose of the legislation in question is to "regulate" the fee payers or to collect revenue to finance broad-based public improvements that cost money.[17] Second, one must determine whether or not the money collected from the fees is segregated and allocated exclusively to "regulat[ing] the entity or activity being assessed."[18] Third, one must ascertain *483 whether a direct relationship exists between the rate charged and either a service received by the fee payers or a burden to which they contribute.[19]

The Covell Tests

I
We begin by examining the primary purpose behind the enactment of SLMC 13.08.175. If the fundamental legislative impetus was to "regulate" the fee payersby providing them with a targeted service or alleviating a burden to which they contributethat would suggest that the charge was an incidental "tool of regulation"[20] rather than a tax in disguise.[21]
In Covell, we first sought to ascertain the central rationale for enactment of Seattle's street utility charges by focusing on the legislative language found in the ordinances themselves:
Although there is language in the ordinances requiring the adoption of a transportation plan along with a funding plan, most of the regulatory language is devoted to fiscal planning rather than toward the type of service or benefit for those who pay fees....
The ordinance language with regard to street improvement and maintenance is of an extremely general nature, and the thrust of the legislation is clearly on funding.[22]
We concluded, "The primary concern of these enactments is with collecting money to pay for [public] improvements rather than with public health, safety, or welfare."[23] Here, as Samis has shown, the "thrust" of the ordinances in question is even more "clearly on funding" than Seattle's ordinances in Covell since, not most, but all its provisions deal exclusively with revenue collection. As the City readily admitted, the "legislation, i.e., the municipal ordinance, imposing the standby charge makes no attempt to regulate the use of water or sewer services."[24] Indeed, as the City unequivocally conceded early on in this litigation: "The primary purpose of the Soap Lake standby charge is to generate revenues."[25]
However, the fact that the ordinances themselves deal exclusively with fiscal matters does not necessarily conclude our inquiry. In Margola Assocs. v. City of Seattle,[26] we wrote:
Under Hillis II, a court can look to the "overall plan" of regulation in construing *484 the purpose of the challenged fee. Likewise, in Teter, this court looked beyond the legislation implementing the fee in order to determine the legislation's purpose. Even though the registration and fee ordinances themselves do not specifically refer to any "overall plan" of regulation or limit the use of revenues, the ordinances should not be viewed in isolation.[27]
The City argues that SLMC 13.08.175 was enacted as a small part of its overall effort to improve the regulation of its city-wide water-sewer system for the general protection of its citizens' health, welfare, and safety,[28] as authorized under Wash. Const. art. XI, § 11 and various statutes.[29] The City thus urges us to read SLMC 13.08.175 in its broader legislative context, namely, SLMC Title 13, which establishes an overall regulatory design for "Public Services."
However, as Samis contended and as counsel for Soap Lake was forced to concede at oral argument, nowhere in that "overall plan" is there a reference to any utility service or burden applicable to the properties being charged here. Indeed, the only provision in all of Title 13 relevant to the vacant, unimproved lots at issue is evidently SLMC 13.08.175, which deals strictly with revenue collection.[30] It is therefore manifest that the City's primary legislative motivation here was to generate additional revenues to finance broad-based public improvements, not to "regulate" those entities paying the standby charge. The City's standby charge thus more closely resembles a tax than a fee under the first part of the Covell test.

II
Second, for a charge to be considered a fee under Covell, we have found it "essential" that the money collected be segregated[31] and "allocated only to the authorized regulatory purpose."[32] Initially, the City appeared to concede that its legislation failed this exclusive allocation test by unequivocally admitting, "The money collected through the standby charge is not allocated exclusively to a regulatory purpose."[33] Later, though, the City argued differently, insisting that it "deposits its availability charges in a separate Water Capital Improvement Fund, and that those funds are use[d] solely for Combined Utility purposes," *485 all of which are "regulatory, involving facilities to regulate water and sewage to protect public health."[34]
Still, simply because charges are allocated to some "broad category"[35] of important public services does not necessarily mean they are "regulatory fees." The second Covell factor requires that "regulatory fees" be "used to regulate the entity or activity being assessed."[36] Here, the only entities being assessed the charge in question are properties subject to no identifiable utility-related "regulatory" activity.[37] The more than $46,000 that the City has collected from Samis since 1990 under SLMC 13.08.175 has been allocated to maintaining and improving the city-wide utility system, "regulating" an entirely distinct group to which the standby charge does not apply, namely, entities connected to the city utility system.[38] Samis has thus shown that, under the exclusive allocation test, the standby charge more closely resembles a tax than a fee.

III
The final test for differentiating fees from taxes is whether there is a "direct relationship" between the fee charged and either a service received by the fee payers or a burden to which they contribute.[39] If no such relationship exists, then the charge is probably a tax in fee's clothing. If, however, a direct relationship exists, then "the charge may be deemed a regulatory fee even though the charge is not individualized according to the benefit accruing to each fee payer or the burden produced by the fee payer."[40] In other words, as long as a "direct relationship" is present, "only a practical basis for the rates is required, not mathematical precision."[41]
This latter point has been a decisive consideration in most of the cases relied upon by the City and its supporting amici. For instance, in Morse v. Wise,[42] we held that the City of Chelan had police power authority to force current sewer customers to pay for improvements to its sewer system, even though new customers were the primary beneficiaries of the improvements. In Teter v. Clark County, we ruled that charges collected from lands shown to be contributing to an increase in surface water runoff were "tools of regulation" rather than taxes because, even though no service was being provided to every fee payer, "the rate schedule bears a reasonable [albeit imprecise] relation to the contribution of each lot" to the shared burden being alleviated by the storm and surface water control facilities.[43] In Thurston *486 County Rental Owners Association v. Thurston County,[44] the court deemed a septic system permit fee charged to finance efforts to reduce ground and surface water contamination in the area to be a valid "regulatory fee" since it was reasonably related to the pollution burden created by new septic systems. In Smith v. Spokane County,[45] additional fees were imposed on "water and sewer customers "[46] in an Aquifer Protection Area to pay for the protection, preservation and rehabilitation of their subterranean water source. While the rates in Smith were fixed and unrelated to the "amount of water used, or whether the household is served by a septic system or a municipal sewer line,"[47] the court held that "[e]nsuring a clean source of drinking water provides a direct benefit to everyone who receives water from the aquifer."[48] In each of these cases, it was clear that the charge was "akin to charges for services rendered"[49] in that a direct relationship existed between the charge and either a service received or a burden to which the payers were contributing.
As Samis has demonstrated, no such direct relationship exists here.[50] First, the properties at issue here by definition have no relationship to the City's water service. The City admits that "[l]iability for the standby charge does not arise from [Samis'] use of a city service."[51] Secondly, the lands at issue are uninhabited properties that generate no sewage of any kind and, as established in the record, do not otherwise burden the City's sewer or water systems.
Soap Lake argues that the standby charge is justified as payment for the general benefit of living in a community with "a financially viable, efficient and operable water/sewer system" as well as the enhancement of the value and marketability of properties where connection to city water and sewer lines is readily "available."[52] We find such arguments untenable under Covell. While the Seattle properties at issue in Covell *487 also stood to benefit from public spending of residential street utility charges on the construction, operation, preservation, and expansion of abutting streets, nearby transportation infrastructure, and city-wide public transit systems,[53] we held that "the direct relationship between the charges and the benefits received [or burden imposed] by those who pay them is missing."[54] Indeed, most public expenditures have the effect of enhancing the value and marketability of nearby real estate. However, stretching the "direct relationship" test to include such indirect enhancements would render the third Covell test meaningless as a guide for distinguishing fees from taxes. While our case law is clear that a "charge may be deemed a regulatory fee even though the charge is not individualized according to the benefit accruing to each fee payer or the burden produced by the fee payer,"[55] here there is neither an identifiable service being received by the fee payers nor a burden to which they contribute to which the City's annual $60 charge has any direct relationship.
In short, all three Covell criteria support the conclusion that the standby charge at issue here is not actually a "regulatory fee" but rather a thinly disguised tax designed to raise funds to finance broad-based public purposes.

Determining Tax's Constitutionality
Lastly, we must determine whether this tax is unconstitutional, as Samis contends. In Covell, we defined property taxes as "an absolute and unavoidable demand against property or the ownership of property."[56] We wrote:
In this case, the street utility charge is not levied against the exercise of any particular right of ownership. Rather, the charge is imposed for the "use or availability of the streets." SMC § 21.100.030. The amount of the charge, however, is levied against property owners to accomplish the public benefit of improving streets.
Consequently, the street utility charge, as assessed, must be declared unconstitutional.[57]
Because liability for the street utility charge in Covell resulted unavoidably from real estate ownership, we found it to be a property tax, which had to be "imposed in a uniform manner based on the value of property" under Wash. Const. art. VII, § 1.[58]
Here also, SLMC 13.08.175 does not levy a charge against the discretionary exercise of any particular right of ownership. Rather, it imposes an unavoidable demand upon ownership itself. The mere act of owning property located near, but unconnected to, the City's water and sewer lines makes one liable. The standby charge matches our definition of a property tax.[59] Because the tax is set at "sixty dollars per year per platted lot or unplatted area" without regard to each land's worth, it is clearly not levied uniformly upon the entire class of real estate as constitutionally required.[60] The factual record in this case makes it clear that SLMC 13.08.175 cannot reasonably be construed in a manner that comports with constitutional imperatives.

*488 CONCLUSION
We conclude that the trial court erred in denying Samis' motion for partial summary judgment. Under Covell's three-part test, Soap Lake's "standby charge" is more akin to a tax than to a fee. Since SLMC 13.08.175 imposes this tax on the mere ownership of select parcels of real estate within the City's jurisdiction, without regard to property value, it violates Wash. Const. art. VII, § 1. We therefore affirm the Court of Appeals and remand for further proceedings consistent with this opinion.
ALEXANDER, C.J., SMITH, MADSEN, SANDERS, IRELAND, JJ., and GUY, J.P.T., concur.
JOHNSON, J. (dissenting).
This case involves the authority to regulate water and sewage as a means of minimizing environmental harm and ensuring safe drinking water. No question exists that Wash. Const. art. XI, § 11 authorizes, if not requires, the government to regulate. Our cases have consistently recognized the validity of this type of regulatory planning. While the majority recognizes our prior cases, it distorts and fundamentally changes the focus and analytical approach of those cases. A proper reading and adherence to the approach we have adopted requires upholding the validity of the regulatory fees involved in this case.
While the majority correctly recognizes Covell v. City of Seattle[1] as the appropriate analytical approach to resolve this case, it turns that analysis on its head and reaches the wrong result. Covell does not support the majority's conclusion. Covell cannot be read in isolation from the cases it relied upon. Those cases recognize local governments must be able to protect the environment and public welfare. Those governments must have the "regulatory tools" with which to do soincluding the authority to collect fees necessary to fund the construction, operation, and expansion of required infrastructure. The majority's approach undermines the government's ability to regulate for the protection of the environment. At its core, this case involves a city's attempt to provide clean water and expand sewer and storm water service through the assessment of a fee to those landowners who directly benefit from these services. We certainly cannot call this an abuse of the police power. These standby fees are not imposed against all property within the political unitthey are imposed only on City of Soap Lake (Soap Lake) property where hook-ups are available. I see nothing wrong or unconstitutional about these fees.
Municipal ordinances carry a strong presumption of constitutionality. Brown v. City of Yakima, 116 Wash.2d 556, 559, 807 P.2d 353 (1991). This means the party challenging the ordinance bears the burden of establishing its invalidity. Letterman v. City of Tacoma, 53 Wash.2d 294, 299, 333 P.2d 650 (1958). Recognizing this presumption, Covell did not override the traditional deference we give to local governments when acting within their police powers. Yet, under the majority's approach, this is the unavoidable result. While the majority recognizes this presumption in theory, a careful reading of the opinion reveals its failure to apply this presumption in fact. No matter how the majority words its analysis, it is the Samis Land Company and the estate (Samis) that must prove the standby charge is a tax.
The majority's subtle shifting of the burden from Samis to Soap Lake is a fatal flaw. Not only is this flaw determinative to the outcome in this case but, perhaps more importantly, this defect also fundamentally alters Covell. The correct application of Covell must begin with the presumption that Soap Lake's ordinance authorizing standby fees for sewage and water systems is constitutional. Once the burden of persuasion is properly placed on Samis, the record shows Samis has failed to provide the necessary evidence.
Covell tells us we must first consider whether the primary purpose of a charge is to raise revenue or to regulate. We examine the overall regulatory scheme to discover the purpose of the charge, not just the language of the text as the majority suggests. As we *489 stated in Margola Associates v. City of Seattle, 121 Wash.2d 625, 854 P.2d 23 (1993):
[A] court can look to the "overall plan" of regulation in construing the purpose of the challenged fee....[T]his court look[s] beyond the legislation implementing the fee in order to determine the legislation's purpose. Even though ... fee ordinances themselves do not specifically refer to any "overall plan" of regulation or limit the use of revenues, the ordinances should not be viewed in isolation.
Margola, 121 Wash.2d at 637, 854 P.2d 23 (citing Teter v. Clark County, 104 Wash.2d 227, 704 P.2d 1171 (1985); Hillis Homes, Inc. v. Public Util. Dist. No. 1, 105 Wash.2d 288, 714 P.2d 1163 (1986)). While we focused closely on the text of the ordinance at issue in Covell, we never suggested that a strict textual analysis was the only method of deciphering the purpose of a municipal charge. In fact, Covell suggests that a strict textual analysis is not always appropriate, explaining in some cases the type of activity is so well recognized as a police power that a regulatory purpose is "self-evident." Covell, 127 Wash.2d at 883, 905 P.2d 324.
The regulatory nature of water and sewage management is self-evident. The importance of municipal regulation of water and waste removal is well established in this state. Article XI, section 11 of the Washington Constitution provides that "[a]ny county, city, town or township may make and enforce within its limits all such local police, sanitary and other regulations as are not in conflict with general laws." "`The scope of police power is broad, encompassing all those measures which bear a reasonable and substantial relation to promotion of the general welfare of the people.'" Covell, 127 Wash.2d at 878, 905 P.2d 324 (quoting Hillis Homes, Inc. v. Snohomish County, 97 Wash.2d 804, 808, 650 P.2d 193 (1982)).
We must look to the overall legislative plan when applying Covell.[2] Keeping in mind the party challenging a fee has the burden of persuasion, we begin our textual analysis with a broad approach. However, under the majority's approach, we are required to read the text narrowly, hunting for some magic words that artificially segregate a genuine regulatory purpose from the financial realities that accompany local regulatory actions. This dogmatic approach undermines the thoughtful analysis we applied in Covell.
Covell and the cases before it require we apply a broader approach. Every financial imposition produces revenue. It is impossible to distinguish between the plainly regulatory purpose of a sewer system or water system and the need for revenue to build, operate, and maintain such a system. That is not the issue. The issue is whether the principal purpose underlying the imposition is fiscal or regulatory. In this case, Soap Lake's overall plan had the plain regulatory purpose of maintaining a sewer/water system for the safety and health of all its citizens and for the protection of its environment. The standby fees are necessary to the revenue stream for the system's operation. Given these facts, I would hold Samis has failed to prove the purpose behind the standby fees is anything but regulatory.
In this case, a narrow reading of the legislative text leads to an unfortunate result. The protection of Washington citizens from disease and the harmful effects of unsanitary conditions is one of the few powers expressly specified in article XI, § 11 of our state constitution. The harms caused by unsafe drinking water, contamination of groundwater, and lack of a properly functioning sewer system are well recognized. The legitimacy of the State's purpose in protecting its waters from contamination and its environment from the harmful effects of unmanaged waste requires little discussion. It is reasonable, if not essential, that the State act to prevent the pollution of its waters by human wastes, disease, and environmental degradation caused by such conditions. The regulatory nature of water and sewage management in this state is axiomatic. Therefore, it is not surprising that Soap Lake did not include a specific section detailing the regulatory purpose of its water and sewer system ordinances. *490 Such language is superfluous, or so one would have thought before the majority's decision in this case.[3]
We have consistently showed deference to the attempts of local governments to provide sewage systems and clean drinking water. Covell supports this approach. A cogent review of prior cases comes from the Court of Appeals in Smith v. Spokane County, 89 Wash.App. 340, 948 P.2d 1301 (1997). In Smith, a class of citizens challenged fees imposed on water and sewer customers within a certain aquifer protection area. Discussing Covell and other cases dealing with the regulation of water and sewage, the Court of Appeals explained:
Additionally, when one compares the facts of this case to the facts of other cases which determined whether fees imposed by governmental entities were regulatory fees or taxes, it is clear that the charges at hand are regulatory fees. In Covell, the court determined that a city ordinance imposing a street utility charge was a tax. The City of Seattle imposed a fee to residents in order to construct, maintain, operate and preserve streets. The court determined that the charges were for the purpose of funding and did not directly relate to any service.
In Thurston County Rental Owners Ass'n v. Thurston County, 85 Wash.App. 171, 178-79, 931 P.2d 208 (1997), Division Two held that the County's imposition of permit fees for the construction of septic systems was a regulatory fee. The County required permits for construction of septic systems in order to protect the groundwater. In that case the court determined that the fees were part of a plan to regulate septic systems.
In Hillis [105 Wash.2d 288, 714 P.2d 1163], the court held that a connection charge to the city's water system was a regulatory fee. The court determined in that case that the charge was part of an overall plan to regulate the use of water.
In Teter, a fee was imposed on property owners to finance flood control operations. In that case the court determined that the charges related to regulation and control of storm and surface waters. As a result, the court determined that the charges were regulatory fees.
In Hillis Homes, Inc. v. Snohomish County, 97 Wash.2d 804, 805-06, 650 P.2d 193 (1982), a fee was imposed on new residential subdivisions for parks, schools, road, and fire protection. In that case, the court determined that the charges were unconstitutional taxes. The court found that the charges were not imposed for any regulatory purpose.
The case at hand is much analogous to Thurston, Hillis, [105 Wash.2d 288, 714 P.2d 1163], and Teter. The charge at issue in all of these cases dealt with water or septic system regulation. Thurston and Teter did not impose charges which were based upon water or septic usage. All the charges benefited the public by furnishing clean drinking water.
Smith, 89 Wash.App. at 351-52, 948 P.2d 1301 (citations omitted) (emphasis added). The Court of Appeals in Smith properly found the charges were part of an overall plan to regulate water quality. The same is true in this case.
What Covell tells us to consider next is whether those funds collected by a local government are allocated only to the authorized regulatory purpose (in this case, the purpose of providing sanitary conditions) or are used for general governmental expenditures. This factor alone is not dispositive. Covell, 127 Wash.2d 874, 905 P.2d 324. In order for Soap Lake's ordinance to survive, Covell requires that the standby fees be segregated and allocated exclusively to the management and improvement of Soap Lake's water and sewage system.
The record in this case demonstrates all standby charges collected by Soap Lake are segregated and used exclusively for water and sewage purposes as required by chapter 43.09 RCW. The funds collected via the standby charge are used solely to facilitate water and sewage regulation. Samis has made no showing to the contrary. Since *491 Samis has not proved a misallocation of funds, the ordinance survives.
Finally, Covell instructs us to look for a direct relationship between the charge and the service received by the person paying the charge, or the burden to which they contribute. Samis must prove the lack of a sufficient relationship. Samis has proved nothing. Samis merely argues, and the majority agrees, that its properties are not being serviced by the system because they are not currently hooked up. However, there is no question the standby fee provides a special benefit to those paying it. Those who pay the fee benefit from ready access to a water and sewer system they otherwise would not have. Samis argues that a benefit or a burden specific to its individual property must be established to meet the "direct relationship" requirement in Covell. Again, however, that is not what is required.
Not all fees calibrate precisely to a benefit or detriment, particularly if the fees relate to public health where hazards are prevented. It is often not possible to precisely establish the benefit to an individual property owner from uncontaminated drinking water or the prevention of sewage-induced disease. Yet, common sense tells us that a water and sewer system obviously provides special benefits to all property owners, whether they are hooked up to the system or not.
For example, Teter, on which Covell relies, involved a group of property owners who challenged city charges that were allocated to providing flood control services. Teter, 104 Wash.2d 227, 704 P.2d 1171. We upheld the charges even though the property owners challenging the charges received no specific benefit or service. Teter, 104 Wash.2d at 230-31, 704 P.2d 1171. We explained the special benefit idea does not apply when a "`city acts pursuant to the police power granted to it to provide sewer service to protect the health of its inhabitants and to defray the expense by making service charges.'" Teter, 104 Wash.2d at 231, 704 P.2d 1171 (quoting Morse v. Wise, 37 Wash.2d 806, 810-11, 226 P.2d 214 (1951)). The same result applies here.
Incorporating our reasoning in Teter, Covell does not require a specific service or benefit be shown when a city is working directly within the scope of its police power. Rather, Covell requires only a showing of a more generalized individual benefit, but one that is directly related to the police power under which the city is making the charges. Such is the case here.
Soap Lake provides to Samis the benefit of clean water sources and an environment with less pollutants and waste. The disease and pollution that result from ineffective sewage and water systems do not stop at the property lines of those currently hooked up to the system. Additionally, Samis benefits from the accessibility to waterlines in the case of fire on its property. Presumably, if there were a brush fire on Samis' property, Samis would want the Soap Lake Fire Department to access some water system to put out the fire before it affected nearby inhabited structures and destroyed the environment on its property. As in Teter, the system-wide facilities at issue here provide protection to all property owners regardless of whether they are currently hooked up to the system or not. The Soap Lake water and sewage system requires planning and development throughout the city and "`affect[s] the prosperity, interests and welfare of all the residents.'" Teter, 104 Wash.2d at 232, 704 P.2d 1171 (quoting RCW 36.89.020). Samis benefits from the overall water and sewage infrastructure in Soap Lake. While the benefit may not be as specific as Samis would like, nonetheless, the service of a functioning sewage and water system is directly related to protecting Samis and other Soap Lake residents from disease and waste.
I would reverse the Court of Appeals and find Samis has failed to show Soap Lake's standby fee is a tax rather than a regulatory fee. Covell is a cogent synthesis of our previous case law. It never supplanted our extensive jurisprudence distinguishing between regulatory fees and unconstitutional taxes. Yet, under the majority's approach, this is the inevitable result. The majority applies Covell too narrowly. The majority's application of Covell is contrary to what the case stands for and seriously undermines our prior cases.
*492 The regulatory purpose of these fees is apparent in Soap Lake's overall plan to regulate water and sewage and provide for a sanitary environment. The funds received through this charge are allocated to the maintenance and improvement of these systems. Samis directly benefits from the sanitary conditions and environmental preservation facilitated by the infrastructure these funds go to support.
NOTES
[1] 127 Wash.2d 874, 905 P.2d 324 (1995).
[2] Samis Land Co. v. City of Soap Lake, 96 Wash. App. 819, 980 P.2d 805 (1999).
[3] In its amicus curiae brief, the Ocean Shores Property Owners (OSPO) urge this court to "avoid the constitutional issue and affirm the Court of Appeals on statutory grounds." Br. of Amicus OSPO at 2. Although the original complaint in this case includes a statutory as well as a constitutional cause of action, Samis' partial summary judgment motion contended only that SLMC 13.08.175 levies an unconstitutional property tax. Moreover, Samis made a single assignment of error in its motion for discretionary review before the Court of Appeals: "The Trial Court erred in concluding that the `standby charge' ... is not a property tax." Br. of Petitioner at 1. The City then presented this court with a single issue for review, namely, whether the standby charge is a valid "regulatory fee," not an unconstitutional tax. Pet. for Review at 1. Samis agreed: "The sole issue in this case is whether the Court of Appeals correctly held that the assessment levied by Soap Lake Ordinance No. 737 is a tax." Suppl. Br. of Resp'ts at 1. RAP 13.7(b) provides, "If the Supreme Court accepts review of a Court of Appeals decision, the Supreme Court will review only the questions raised in the motion for discretionary review, if review is sought of an interlocutory decision, or the petition for review and the answer, unless the Supreme Court orders otherwise upon the granting of the motion or petition." While Amicus OSPO's statutory inquiry is an interesting one, the only question before us is whether the trial court erred in denying Samis' constitutional challenge.
[4] Reid v. Pierce County, 136 Wash.2d 195, 201, 961 P.2d 333 (1998).
[5] Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co., 115 Wash.2d 506, 516, 799 P.2d 250 (1990) (citing Morris v. McNicol, 83 Wash.2d 491, 494, 519 P.2d 7 (1974)).
[6] Weden v. San Juan County, 135 Wash.2d 678, 690, 958 P.2d 273 (1998); High Tide Seafoods v. State, 106 Wash.2d 695, 698, 725 P.2d 411 (1986).
[7] City of Tacoma v. Luvene, 118 Wash.2d 826, 841, 827 P.2d 1374 (1992) (citing State v. Dixon, 78 Wash.2d 796, 804, 479 P.2d 931 (1971)); Belas v. Kiga, 135 Wash.2d 913, 920, 959 P.2d 1037 (1998).
[8] The City argues that it is constitutionally authorized to impose the standby charge under its general police power authority to enact ordinances that are reasonably necessary to protect public health, safety, and welfare. Local governments derive their police powers from Wash. Const. art. XI, § 11. See Brown v. City of Yakima, 116 Wash.2d 556, 559, 807 P.2d 353 (1991) (citing Hass v. City of Kirkland, 78 Wash.2d 929, 932, 481 P.2d 9 (1971)). However, it is well established that while police powers include the authority to enact laws promoting the health and welfare of its citizens, they do not include the power to tax. Covell, 127 Wash.2d at 879, 905 P.2d 324 (citing Margola Assocs. v. City of Seattle, 121 Wash.2d 625, 634, 854 P.2d 23 (1993); Hillis Homes, Inc. v. Snohomish County, 97 Wash.2d 804, 809, 650 P.2d 193 (1982) (Hillis Homes I)); see also Wash. Const. art. VII, § 5. While tax collection is an indispensable middle step toward accomplishment of vital public objectives, it cannot be characterized as an activity of government that itself promotes taxpayers' health or welfare. Thus, if the standby charge is a tax, it is not authorized under the City's police powers.
[9] Covell, 127 Wash.2d at 884, 905 P.2d 324 (quoting King County Fire Prot. Dist. No. 16 v. Housing Auth. of King County, 123 Wash.2d 819, 834, 872 P.2d 516 (1994)).
[10] See Covell, 127 Wash.2d at 878, 905 P.2d 324 ("Governments may impose regulatory fees under their general police powers.") (citing Margola, 121 Wash.2d at 634-35, 854 P.2d 23; Wash. Const. art. XI, § 11).
[11] "For the sake of clarity," we have collectively referred to fees and related charges as "regulatory fees" since they receive similar treatment in law. Covell, 127 Wash.2d at 878 n. 1, 905 P.2d 324.
[12] See, e.g., Frach v. Schoettler, 46 Wash.2d 281, 289, 280 P.2d 1038 (1955) ("Regulatory fees paid are not subject to the constitutional restrictions on the power to tax."). One example is what charges the United States government may be subjected to. While state and local governments may collect from federal entities any charges akin to fees for services provided, article VI, clause 2 of the United States Constitution prevents them from collecting any taxes from them. See, e.g., United States v. City of Huntington, 999 F.2d 71, 74 (4th Cir.1993), cert denied, 510 U.S. 1109, 114 S.Ct. 1048, 127 L.Ed.2d 371 (1994).
[13] "All taxes shall be uniform upon the same class of property within the territorial limits of the authority levying the tax.... All real estate shall constitute one class...." Wash. Const. art. VII, § 1. We have noted that tax uniformity is "`the highest and most important of all requirements applicable to taxation under our system.' "Inter Island Tel. Co. v. San Juan County, 125 Wash.2d 332, 334, 883 P.2d 1380 (1994) (quoting Savage v. Pierce County, 68 Wash. 623, 625, 123 P. 1088 (1912)). It is therefore critical that valid fees be carefully differentiated from unconstitutional taxes. See Belas, 135 Wash.2d at 920-22, 959 P.2d 1037 (reviewing history of article VII).
[14] "Except as hereinafter provided and notwithstanding any other provision of this Constitution, the aggregate of all tax levies upon real and personal property by the state and all taxing districts now existing or hereafter created, shall not in any year exceed one percent of the true and fair value of such property in money...." Wash. Const. art. VII, § 2.
[15] Covell, 127 Wash.2d at 888, 905 P.2d 324 (quoting Huntington, 999 F.2d at 74).
[16] King County Fire Prot. Dist. No. 16 v. Housing Auth. of King County, 123 Wash.2d at 833, 872 P.2d 516 (citing Margola, 121 Wash.2d at 635, 854 P.2d 23); see also Covell, 127 Wash.2d at 886, 905 P.2d 324 (citing Hillis Homes I, 97 Wash.2d at 809, 650 P.2d 193).
[17] Covell 127 Wash.2d at 879, 905 P.2d 324 (citing Hillis Homes I, 97 Wash.2d at 809, 650 P.2d 193 (quoting Haugen v. Gleason, 226 Or. 99, 104, 359 P.2d 108 (1961))).
[18] Covell, 127 Wash.2d at 886, 905 P.2d 324 (citing San Telmo Assocs. v. City of Seattle, 108 Wash.2d 20, 735 P.2d 673 (1987)) ("Because the fees were not used to regulate the entity or activity being assessed, the court held the fees were taxes."); see also Covell, 127 Wash.2d at 879, 905 P.2d 324 (citing Hillis Homes, Inc. v. Public Util. Dist. No. 1, 105 Wash.2d 288, 300, 714 P.2d 1163 (1986) (Hillis Homes II), and Teter v. Clark County, 104 Wash.2d 227, 233-34, 704 P.2d 1171 (1985)).
[19] Covell, 127 Wash.2d at 879, 905 P.2d 324 (citing Teter, 104 Wash.2d at 232, 704 P.2d 1171; Hillis Homes II, 105 Wash.2d at 301, 714 P.2d 1163). Notably, while the dissenters in Covell disputed the majority's interpretation and application of these factors, none disagreed "that whether a charge is a tax or a regulatory fee depends upon [these] three factors." 127 Wash.2d at 892, 905 P.2d 324. (Utter, J., dissenting).
[20] Covell, 127 Wash.2d at 879, 905 P.2d 324; see also Teter, 104 Wash.2d at 239, 704 P.2d 1171.
[21] Covell, 127 Wash.2d at 879, 905 P.2d 324; Hillis Homes I, 97 Wash.2d at 809-10, 650 P.2d 193.
[22] Covell, 127 Wash.2d at 880-81, 905 P.2d 324.
[23] Id. at 883, 905 P.2d 324.
[24] Complaint ¶23, Clerk's Papers (CP) at 3-4. The City responded to this statement, "In answer to Paragraphs 23., and 24., Defendant admits the same." Answer ¶ 9, CP at 12. Samis reiterated the statement in its Request for Admission No. 24, eliciting this response: "Defendant City of Soap Lake admits that Ordinance No. 737[ ] does not, in and of itself, regulate the use of water and/or sewer services, but states that it is only part of the entire water/sewer ordinances of the City, which do regulate the use of water and or services." CP at 122.
[25] Complaint ¶ 21, CP at 3. The City responded to this statement, "In answer to Paragraph 21., Defendant admits the same." Answer ¶ 7, CP at 12. Samis reiterated the statement in its Request for Admission No. 22, eliciting this response: "Defendant City of Soap Lake admits that the primary purpose of the standby charge is to generate revenues, which, like all other Water/Sewer rates and charges, must, by law, be paid into the Water/Sewer Enterprise Fund, and which must, by law, be used to regulate and provide for water/sewer services in the City, which includes the extension of lines to plaintiff's properties." CP at 120.
[26] 121 Wash.2d 625, 854 P.2d 23 (1993).
[27] Margola, 121 Wash.2d at 637, 854 P.2d 23.
[28] The City stresses the vital role that community water and sewer systems play in protecting drinking water and preventing human diseases such as typhoid. Its supporting amici invoke Turkey's August 1999 earthquake disaster to illustrate "the hazards communities face if water and sewage are not regulated." Br. of Amici Ass'n of Washington Cities and the City of Ocean Shores at 6 & n. 3; see also Dissent at 1. Such remarks miss the point. Water and sewer systems are unquestionably important to public health and safetyas are city streets, traffic signals, and local law enforcement. The issue here, though, is whether legally requiring owners of vacant, uninhabited lots to pay for public utility services that they have no connection to and that alleviate no burden to which they contribute is a "regulatory fee" or a tax.
[29] Br. of Resp'ts at 6-7. The City cites various statutes authorizing cities of second class like Soap Lake, inter alia, (a) to establish and regulate city utility systems, such as RCW 35.21.210 and RCW 35.23.440(22) and (35); and (b) to charge "customers" who "use" such systems, such as RCW 35.67.020 and RCW 35.92.010.
[30] See SLMC Title 13, reproduced in Pet. for Review, App. D. By contrast, in State v. Miller, 149 Wash. 545, 271 P. 826 (1928), we found that a game farming license fee was "not in the nature of a tax, but a fee for the purpose of regulation, and not for revenue," that the fee structure was clearly "designed [to pay] for costs of inspection necessary for regulation," and that the legislation in question "breathe[d] the spirit of regulation and protection." Id. at 551, 271 P. 826.
[31] Covell, 127 Wash.2d at 885, 905 P.2d 324 (emphasis added).
[32] Id. at 879, 905 P.2d 324 (emphasis added); id. at 886, 905 P.2d 324 (citing San Telmo Assocs. v. City of Seattle, 108 Wash.2d 20, 24, 735 P.2d 673 (1987)) ("Because the fees were not used to regulate the entity or activity being assessed, the court held the fees were taxes.").
[33] Complaint ¶ 24, CP at 4. The City responded to this statement, "In answer to Paragraphs 23., and 24., Defendant admits the same." Answer ¶ 9, CP at 12. Samis reiterated the statement in its Request for Admission No. 25, eliciting this response: "Defendant City of Soap Lake admits that the money collected through the standby charge is not allocated exclusively to a regulatory purpose, but states that part of it is used to regulate the use of water and/or sewer services in the City of Soap Lake." CP at 123.
[34] Suppl. Br. of Petitioner at 6.
[35] 127 Wash.2d at 888, 905 P.2d 324 ("Given the absence of a regulatory purpose, it is insignificant that the funds collected are to be expended `for transportation purposes only' (a broad category indeed).").
[36] Id. at 885-86, 905 P.2d 324 (citing San Telmo, 108 Wash.2d at 24, 735 P.2d 673) (emphasis added).
[37] This court has recognized that if "the revenues to be generated by [a charge] greatly exceed the proper regulatory costs associated with those ordinances ...," then "the ordinances would have to be classified under the Hillis [Homes] I test as being primarily fiscal rather than regulatory." Margola, 121 Wash.2d at 638, 854 P.2d 23.
[38] Utility "connection fees" such as those at issue in Hillis Homes II are good examples of valid regulatory fees, because unlike Soap Lake's standby charges, which are imposed exclusively upon vacant lots, connection fees "pay for only those improvements to the water system necessitated by the [fee payers], and hence will benefit them alone." Hillis Homes II, 105 Wash.2d at 300, 714 P.2d 1163. Soap Lake currently collects sewer connection fees under SLMC 13.08.050 and water connection fees under SLMC 13.08.100, as authorized by RCW 35.92.025.
[39] Covell, 127 Wash.2d at 879, 905 P.2d 324 (citing Teter, 104 Wash.2d at 232, 704 P.2d 1171; Hillis Homes II, 105 Wash.2d at 301, 714 P.2d 1163).
[40] Covell, 127 Wash.2d at 879, 905 P.2d 324 (citing Hillis Homes II, 105 Wash.2d at 301, 714 P.2d 1163)
[41] Teter, 104 Wash.2d at 238, 704 P.2d 1171.
[42] 37 Wash.2d 806, 226 P.2d 214 (1951).
[43] 104 Wash.2d at 237-38, 704 P.2d 1171 (emphasis added). In other words, while the property owners in Teter did not receive a service, "the court found the county had a reasonable basis to conclude there was a contribution to increased surface water runoff in the basin from the fee payer's property." Covell, 127 Wash.2d at 882, 905 P.2d 324 (emphasis added). By contrast, Samis' vacant, uninhabited lots were neither receiving a service nor contributing to any shared burden that the City's standby charges were being used to alleviate. As we made clear in Covell, "regulatory fees" must have a "direct relationship" with either one or the other. Covell, 127 Wash.2d at 879, 905 P.2d 324.
[44] 85 Wash.App. 171, 931 P.2d 208, rev. denied, 132 Wash.2d 1010, 940 P.2d 655 (1997).
[45] 89 Wash.App. 340, 948 P.2d 1301 (1997).
[46] Id. at 345, 948 P.2d 1301 (emphasis added). Unoccupied lands were not subject to the fee in Smith. Id. at 346-47, 948 P.2d 1301.
[47] Id. at 346, 948 P.2d 1301.
[48] Id. at 351, 948 P.2d 1301 (emphasis added).
[49] Covell, 127 Wash.2d at 884, 905 P.2d 324 (quoting King County Fire Prot. Dist. No. 16, 123 Wash.2d at 834, 872 P.2d 516).
[50] The City's citation to Otis Orchards Co. v. Otis Orchards Irrigation District No. 1, 124 Wash. 510, 215 P. 23 (1923) is inapposite. That case involved special assessments in a "duly organized irrigation district under the laws of this state." Id. at 511, 215 P. 23; see, generally, Wash. Const. art. VII, § 9; RCW 35.23.440(47); RCW 35.23.570; RCW 35.43.040; RCW 35.43.042. There was no showing that a specifically authorized special assessment was at issue here. See Covell, 127 Wash.2d at 889, 905 P.2d 324 (rejecting characterization of charges as special assessments); Teter, 104 Wash.2d at 230, 704 P.2d 1171 (same); Morse, 37 Wash.2d at 810-11, 226 P.2d 214 (same).
[51] Complaint ¶ 33, CP at 5. The City responded to this statement, "In answer to Paragraph 33., Defendant admits the same." Answer ¶ 14, CP at 12. Samis reiterated the statement in its Request for Admission No. 34, eliciting this response: "Defendant City of Soap Lake admits that the liability for the standby charge does not arise from the use of a service, but from the City making water and/or sewer services available to Plaintiffs'properties." CP at 132.
[52] Br. of Resp'ts at 19. Under Covell's analysis of services, it is not enough to identify one that could potentially be received someday. See 127 Wash.2d at 879, 905 P.2d 324 ("service received by those who pay the fee") (emphasis added). The City cites Ronald Sewer Dist. v. Brill, 28 Wash.App. 176, 622 P.2d 393 (1980), where the Court of Appeals found "availability fees" to be authorized under chapter 56.16 RCW as "an exercise of [a legislature's] power to protect health and welfare." Id. at 178, 622 P.2d 393 (citing Morse, 37 Wash.2d at 806, 226 P.2d 214). The Brill court, however, was asked only to construe an availability fee statute, not to determine whether it levied an unconstitutional property tax. Moreover, Brill predates not only Covell (1995) but also most of the case law upon which Covell was based.
[53] Covell, 127 Wash.2d at 877, 905 P.2d 324.
[54] Id. at 888, 905 P.2d 324.
[55] Id. at 879, 905 P.2d 324 (citing Hillis Homes II, 105 Wash.2d at 301, 714 P.2d 1163).
[56] Covell, 127 Wash.2d at 890, 905 P.2d 324 (citing Black v. State, 67 Wash.2d 97, 99, 406 P.2d 761 (1965)) ("Seattle's street utility charge best fits the definition of a property tax, which is an absolute and unavoidable demand against property or the ownership of property.").
[57] Covell, 127 Wash.2d at 891, 905 P.2d 324.
[58] Covell, 127 Wash.2d at 878, 905 P.2d 324 (citing Wash. Const. art. VII, § 1, and Boeing Co. v. King County, 75 Wash.2d 160, 165, 449 P.2d 404 (1969)).
[59] See Harbour Village Apartments v. City of Mukilteo, 139 Wash.2d 604, 607, 989 P.2d 542 (1999); see also id. at 611-12, 989 P.2d 542 (Talmadge, J., dissenting) ("We have repeatedly recognized a property tax is imposed on the mere ownership of tangible and intangible property while an excise tax is levied against the exercise of particular aspects of ownership.") (citing, e.g., Covell, 127 Wash.2d at 890-91, 905 P.2d 324).
[60] We therefore need not decide whether Soap Lake was statutorily authorized to impose this tax. See, e.g., Hillis Homes I, 97 Wash.2d 804, 650 P.2d 193.
[1] 127 Wash.2d 874, 905 P.2d 324 (1995).
[2] Title 13 of the Soap Lake Municipal Code (SLMC) represents Soap Lake's comprehensive approach to water quality control and waste disposal and is replete with provisions designed to meet Soap Lake's obligation to protect the welfare of its citizens.
[3] Presumably, if Soap Lake had drafted the relevant ordinances more specifically to spell out the regulatory purpose, the ordinances would survive even under the majority's approach.